Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KIMBERLY C., individually and on behalf of B. C. a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>BENEFIT & RISK MANAGEMENT SERVICES, and the DIGNITY HEALTH WELFARE BENEFITS PLAN.<br><br>Defendants. | COMPLAINT<br><br>Case No. 4:21-cv-00012-DN |

Plaintiff Kimberly C. ("Kimberly") individually and on behalf of B. C. ("B.") a minor, through her undersigned counsel, complains and alleges against Defendants Benefit & Risk Management Services ("BRMS") and the Dignity Health Welfare Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Kimberly and B. are natural persons residing in Ventura County, California. Kimberly is B.'s stepmother.

1

2. The Plan relied on Anthem BlueCross Blue Shield of California ("Anthem") and Benefit & Risk Management Services ("BRMS") to provide third-party claims administrations services for the Plaintiffs during the treatment at issue in this case. The medical plan document detailing the Plaintiffs' coverage identifies BRMS as the claims administrator for the Plan.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Kimberly was a participant in the Plan and B. was a beneficiary of the Plan at all relevant times. Kimberly and B. continue to be participants and beneficiaries of the Plan.

4. B. received medical care and treatment at Turn About Ranch ("TAR") from January 29, 2018, to May 8, 2018. TAR is an inpatient treatment facility located in Utah, which provides sub-acute residential treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. The Plan through its third-party administrator BRMS, denied claims for payment of B.'s medical expenses in connection with his treatment at TAR. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Kimberly for the medical expenses she has incurred and paid for B.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BRMS and its partners provide healthcare coverage for treatment across the United States, including Utah, and the treatment at issue took place in Utah. Finally, in light of the sensitive nature

of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### B.'s Developmental History and Medical Background

9. B. began acting out around the time that he was eleven years old when his biological parents got divorced. This introduced a great amount of instability into B.'s life and he responded with emotional dysregulation and physical aggression. These behaviors only escalated as B. grew older.

10. B. started abusing substances (particularly alcohol and marijuana) on a daily basis. He started refusing to attend school and was failing his classes. B. would threaten to run away and often did so, staying out until the early morning. B. stated that he would rather live in foster care or on the street than with his biological mother.

11. B. started attending weekly therapy but it was largely ineffectual. On one occasion, B. refused to go on a trip with his mother and when she took his phone as punishment, he threatened to kill himself. B. was hospitalized shortly afterwards.

12. Following his hospitalization, B.'s family had to call the police on four separate occasions within the span of a month due to threats, running away, school refusal, and property damage. In one incident on January 25, 2018, shortly before B.'s admission to TAR, he kicked in a television, destroyed a security camera, and threatened to kill

himself. The police were called and attempted to take B. to an adolescent crisis center but were unable to do so as no beds were available.

## TAR

13. B. was admitted to TAR on January 29, 2018, via a crisis transportation service. B.'s treatment was precertified by Anthem.

14. In an Explanation of Benefits ("EOB") statement dated July 11, 2018, BRMS denied payment for B.'s treatment under comment code 300: "This service is not covered when performed by a Non-PPO Provider."

15. In a letter dated October 10, 2018, Kimberly appealed the denial of payment for B.'s treatment.[1] She argued that the treatment B. received at TAR was a covered benefit under the terms of the Plan.

16. She stated that B. was sent to TAR under unique emergency circumstances and quoted the following provision of her summary plan description:

> Under certain emergencies and limited circumstances where a Covered Person may not have a choice or may require involuntary use of Tier 2 or out of network Hospital-based services or Providers (such as anesthesiologists, radiologists, neonatologists, or pathologists) services may be covered at the Tier 1 benefit.

17. She stated that prior to B.'s admission to treatment, TAR contacted Anthem and was told that the initial portions of B.'s treatment were approved. Kimberly included a copy of this letter with the appeal. She wrote that "Considering that Anthem certified [B.]'s treatment, we had no reason to expect that Dignity would deny [B.]'s treatment at TAR for being out of network." She contended that she had done her due diligence to comply with the terms of the Plan and ensure that B.'s treatment was covered.

---

[1] Kimberly's appeals are addressed to Dignity Health Attn: Benefit & Risk Management Services. Many of the references to BRMS in the complaint are referred to using the name Dignity in Kimberly's letters.

18. She reminded BRMS of its responsibilities under ERISA, including acting in her best interest and assigning a reviewer with experience in treating the mental health and behavioral conditions that B. suffered from, as well as disclosing the identity and qualifications of that reviewer.

19. She pointed out that B. had tried to run away from TAR on multiple occasions and that if he were instead being treated at home where he could not be as closely monitored, he would have surely succeeded.

20. She included letters of medical necessity with the appeal. In a letter dated April 25, 2018, B.'s therapist Stazan Sina, Ph.D., wrote in part:

> …This letter is being written in support of the decision to seek short-term residential treatment for [B. C.] in January of 2018. At the time, [B.]'s once weekly outpatient treatment was not progressing. He, in fact was rapidly engaging in high-risk behaviors that he was so adamant in continuing and to which his parents were unable to effectively respond. When considering the extreme behaviors he was engaging in, combined with the history of parental difficulty managing these behaviors, it seemed warranted to quickly place him into a higher level of structured care. …

Robert Caldwell, CSW, B.'s therapist at TAR wrote in a letter dated September 20, 2018:

> …[B.] was enrolled into Turn About Ranch on January 29, 2018 due to an emergency situation at home. [B.'s] defiance was extreme with his parents and he reached a level where he was willing to jump out of a moving car his father was driving to get away. He was at high risk of running away from home and leaving his family and hanging out with friends that were into criminal activity. If Mr. [C.] would not have made immediate decision [sic] to hire a transport company and send [B.] to Turn About Ranch [B.] would have continued to put himself at risk by getting high on marijuana, joy riding with his friends, and running away from home. [B.] was very defiant at home, and this continued in the program. On two occasions [B.] helped plan a runaway attempt at Tar and was involved in both attempts. He left the safety of the program at night on one occasion and was caught in the wilderness by staff. [B.] has a very high level of defiance and also is very narcissistic. I hope this helps you understand the level of danger [B.] was in before he came to the program due to his defiance and criminal mindset at the time. …

21. She wrote that it was the opinion of all of B.'s clinical professionals that a residential level of care was medically necessary. She reiterated that the treatment was a covered benefit under the terms of the Plan and requested that if BRMS did not pay the claim that it provide her with a copy of all documents under which the Plan was operated including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, the Plan's mental health and substance abuse criteria, and any reports or opinions from any physician or other professional regarding the claim. (collectively the "Plan Documents")

22. On December 18, 2018, Kimberly submitted a complaint to the Plan Administrator, stating that BRMS had never responded to her level one appeal, despite the fact that she could confirm that BRMS had received the appeal and the deadline for BRMS to respond had long since passed. She requested that as BRMS had failed to fulfill its obligation to review the appeal that the Plan Administrator assist her in getting the adverse determination overturned.

23. On March 8, 2019, Kimberly submitted a second appeal for B.'s denied treatment at TAR. She noted that despite confirming that her initial appeal had been confirmed to be delivered on October 11, 2018, she had not received a response to that appeal. She pointed out that as of the submission of her level two appeal, more than 145 days had elapsed with no response, despite the terms of the insurance policy stating that a response would be issued within 30 days of receipt. She asserted that this was a violation of BRMS's fiduciary duty.

24. She wrote that this failure to engage in the appeals process was "impeding our ability to argue our son's case and seek coverage for his medically necessary treatment." She requested that although it had failed to respond to her initial appeal, that BRMS fulfill its ERISA obligation to respond to this appeal within 30 days.

25. She reiterated that the decision to send B. to residential treatment was not made lightly, but was done because B.'s "escalating aggression, suicidal ideations and threats, and episodes of emotional dysregulation which often resulted in property damage became far too much for us…" and outpatient treatment was no longer effective.

26. She again requested a copy of the Plan Documents as well as a copy of the Plan's skilled nursing and rehabilitation facility criteria "so we may perform a full parity analysis of our plan to ensure our benefits are being offered fairly."

27. On May 20, 2019, Kimberly sent another letter to BRMS to protest the lack of response to her appeals. She wrote that up to this point she had submitted a level one appeal, a level two appeal, and a complaint, but had yet to receive a response to any of these documents. She wrote that it was, "clear that Dignity Health does not take their contractual relationship with us seriously. If they did, then our appeals and complaint would have been responded to within the timeframe outlined in our plan."

28. She reiterated that the terms of the Plan clearly stated that the timeframe for BRMS to respond to the appeal was 30 days, she wrote that it had now been over 200 days from the confirmed receipt of her level one appeal and she had still not received a response, in spite of multiple attempts to resolve the situation.

29. She stated that her appeal materials were sent to the correct address and that she had even confirmed it was correct by contacting BRMS[2]. She stated that when she did not receive a response, she again contacted BRMS and was told that the appeal should have been sent to Anthem.

30. Kimberly wrote in the letter, "Why would we need to submit our appeal to Anthem when Anthem is not our plan administrator and we received explicit instructions to send the appeal to Dignity Health? Again, this is unacceptable and clearly an attempt on Dignity Health's part to obstruct the appeals and claims process."

31. She wrote that she again contacted BRMS with regards to her level two appeal and was again told that the appeal should have been sent to Anthem. She stated that after informing the BRMS representative that this contradicted the express terms of the governing plan document which stated that the appeals were to be sent to BRMS, she was placed on hold for a few minutes and the call was abruptly terminated.

32. She stated that she called back and was told by another representative that BRMS was unable to find the appeal and that she should resend it. Kimberly wrote that she had conclusive proof that the appeal was delivered and signed for.

33. She wrote in the letter that she had requested to speak to a supervisor but was told one was not available and she would be contacted within 48 hours. This response never came. Kimberly stated that this letter constituted her notice that the appeals process was exhausted according to the terms of the Plan.

34. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

---

[2] Kimberly's contact was done through a representative.

35. The denial of benefits for B.'s treatment was a breach of contract and caused Kimberly to incur medical expenses that should have been paid by the Plan in an amount totaling over $59,000.

## **CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

36. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BRMS, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

37. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

38. The Plan provided the Plaintiffs with a document titled MEDICAL PLAN DOCUMENT DHMP VENTURA EPO which outlines the terms of the Plan. This document states on page one:

> …DIGNITY HEALTH is named the Plan Administrator for the Plan. The Plan Administrator has retained the services of independent third party administrators to process claims and handle other duties for this component plan, known as Claims Administrators. The Claims Administrator for this component plan is Benefit & Risk Management Services, Inc. (hereinafter "BRMS") for medical claims, and Express Scripts for pharmacy claims. …

39. On page 64 under the heading CLAIM APPEAL PROCESS it is stated in part:

> If your claim for benefits is wholly or partially denied, you, or someone on your behalf, are entitled to file a request for review with the Claims Administrator for your benefit plan. …

9

> The Claims Administrator will make a full and fair review of your request and may ask for additional information. Your request for review of the denial will be conducted by an appropriate named fiduciary of the Plan, who is neither the individual who made the initial benefit determination nor a subordinate of such individual. The review of the denied claim will not afford that denial any deference. …
>
> You will receive written notification of the decision on your appeal within:
> - 72 hours, for Urgent Care Claims
> - 15 days, for pre-service claims that are not Urgent Care Claims and require prior authorization, pre-admission certification or continued stay approval before medical care is received.
> - 30 days for all other claims (those that are neither urgent nor require prior approval) …

40. It is further stated on page 66:

    > …A Claimant will not be required to exhaust the internal claims and appeal procedures described above if the Plan fails to adhere to the claims procedures requirements. In such an instance, a Claimant may proceed immediately to the External Review Program or make a claim in court. …

41. BRMS and the agents of the Plan breached their fiduciary duties to B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of B.'s claims.

42. The actions of BRMS and the Plan in failing to provide coverage for B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

43. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

    WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for B.'s medically necessary treatment at

    TAR under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

    DATED this 29th day of January, 2021.

                By  s/ Brian S. King
                   Brian S. King
                   Attorney for Plaintiffs

County of Plaintiffs' Residence:
Ventura County, California